**RECORD NO. 15-1002**

In The

# United States Court Of Appeals
## For The Fourth Circuit

## LEVERT SMITH; NELSON D. RADFORD,
**Co-Administrators of the Estate of Joseph Jermaine Porter,**

*Plaintiffs – Appellants,*

v.

## SCOTTSDALE INSURANCE COMPANY,

*Defendant – Appellee,*

and

**SCOTTSDALE INDEMNITY COMPANY; NATIONWIDE INSURANCE COMPANY,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING**

_____

## BRIEF OF APPELLANT
_____

Timothy F. Cogan
Patrick S. Cassidy
CASSIDY, COGAN, SHAPELL
  & VOEGELIN, LC
1413 Eoff Street
Wheeling, WV 26003
(304) 232-8100

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
         (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                                YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES    NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)     YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?     YES    NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

# CERTIFICATE OF SERVICE

****************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____     _____

(signature)     (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
        (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                         YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                             YES     NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____      _____
        (signature)                                              (date)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................v

STATEMENT OF JURISDICTION.....................................................................1

ISSUES PRESENTED...........................................................................................1

STATEMENT OF THE CASE..............................................................................2

     I.     FACTUAL BACKGROUND ..............................................................2

          A.    The parties.................................................................................2

          B.    The Underlying Case In The Southern District Of West Virginia ..................................................................................3

          C.    The Case Appealed From In The Northern District Of West Virginia ........................................................................4

     II.    RULINGS PRESENTED FOR REVIEW .........................................10

SUMMARY OF ARGUMENT .............................................................................10

ARGUMENT ........................................................................................................13

     THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST THE ESTATE .........................................................13

     I.     THE STANDARD OF REVIEW IS DE NOVO ...............................13

     II.    THE COURT ERRED WHEN IT REQUIRED BUT-FOR CAUSATION, RELYING UPON SUPERSEDED WEST VIRGINIA CASE LAW ...................................................................13

     III.   THIS COURT SHOULD REVERSE BECAUSE THE DISTRICT COURT FAILED TO FOLLOW WEST VIRGINIA LAW MAKING A PRIMA FACIE CASE A *DE MINIMIS* BURDEN WHEN IT FOUND THAT THE ESTATE DID NOT ESTABLISH A PRIMA FACIE CASE .............................................15

IV.   THIS COURT SHOULD REVERSE BECAUSE THE
      DISTRICT COURT SET A BAR FOR THE ESTATE HIGHER
      THAN WEST VIRGINIA LAW ALLOWS BY RAISING AND
      RULING ON AN ISSUE NOT RAISED BY ANY OF THE
      PARTIES .........................................................................................15

V.    THIS COURT SHOULD REVERSE BECAUSE THE
      DISTRICT COURT MISUNDERSTOOD WEST VIRGINIA
      LAW ON THE DUTY TO INVESTIGATE ......................................16

      A.    *Michael* and *Fairmont Specialty* provide the duty ..................17

      B.    Other Sources Confirm Scottsdale's Duty to Investigate .........23

      C.    Head in the Sand and Purposeful Ignorance by Scottsdale ......20

      D.    Even Apart From West Virginia Case Law, The Claims
            Adjuster Admitted A Duty To Investigate The Claim
            Fairly And Her Boss A Duty To Consider Claims of Racial
            Animus .......................................................................................22

      E.    Berard Also Located the Duty To Investigate ..........................23

      F.    Credibility Aspects Bearing On The Duty To Investigate
            Should Have Defeated Summary Judgment .............................28

VI.   THIS COURT SHOULD REVERSE BECAUSE THE TRIAL
      COURT HELD THAT A CONSENT CLAUSE IN AN
      INSURANCE POLICY INSULATED THE INSURANCE
      COMPANY FROM ANY DUTY TO TAKE ANY ACTION
      DESPITE RECEIVING EVIDENCE OF RACIAL ANIMUS
      ON THE PART OF THE POLICYHOLDER ...................................30

      A.    The District Court Erred In Finding that Scottsdale Had
            No Options ................................................................................31

      B.    Courts Have Found Applications of Consent to Settle
            Provisions Void as Contrary to State Statute or Policy ............41

VII.   THIS COURT SHOULD REVERSE THE DISTRICT COURT, WHICH RESOLVED DISPUTED ISSUES OF MATERIAL FACT IN FINDING THAT THE PLAINTIFF FAILED TO SHOW THAT THE REASONS BY THE INSURANCE COMPANY AMOUNTED TO PRETEXT ......................................... 41

    A.   Evidence From Berard Was Neglected Or Wrongly Rejected ...................................................................... 39

    B.   The Court Mishandled "Comparator" Evidence .................... 41

    C.   The Trial Court Fully Credited Testimony By Adjuster Aliotta, Resolving Facts, That The Case Was Not Racially Charged ............................................................................ 42

    D.   The District Court Found Factually As To Causation ............ 44

    E.   The District Court Erred As Matter Of Law Regarding "Deviation" Testimony .......................................................... 45

    F.   The District Court Ignored Factual Disputes of Material Fact .................................................................................... 48

VIII.  THIS COURT SHOULD REVERSE THE DISTRICT COURT'S AFFIRMANCE OF THE DECISION BY THE MAGISTRATE COURT RESTRICTING DISCOVERY ON THE BASIS OF ATTORNEY CLIENT PRIVILEGE AND WORK PRODUCT EXCEPTION ...................................................... 49

    A.   Standard of Review ................................................................ 49

    B.   The Burden Of Proof Rested on Scottsdale, Which Did not Discharge It ................................................................... 50

    C.   What Some Have Dubbed "Directly At Issue" Waiver Requires Disclosure ............................................................. 52

    D.   Plaintiffs Should Get Documents Addressing Potential Large Loss Or Excess Liability As Fact Work Product .......... 56

E.    The District Court Abused Its Discretion In Failing To Provide Internal Response To The "Policy Limits Demand" ...................................................................................56

CONCLUSION .........................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

iv

# TABLE OF CONTENTS

*Page(s)*

***Cases:***

*Alabama Farm Bureau Mutual Insurance v Clem,*
   273 So.2d 218 (Ala App. 1973)....................................................34

*Alch v. Superior Court,*
   122 Cal.App.4th 339, 19 Cal.Rptr.3d 29 (2nd Dist.2004) ...........................35

*Alexander Mfg. v. Ill. Union Ins. Co.,*
   666 F. Supp. 2d 1185 (D.C. Cir. 2009) .......................................34

*Allen v. West Virginia Human Rights Commission*
   174 W.Va. 139, 324 S.E.2d 99 (1984) ........................................54

*Anderson v Liberty Lobby,*
   477 U.S. 242, 106 S. Ct. 2505 (1986) ......................................6, 37

*Barefoot v Sundale Nursing Home,*
   193 W.Va. 475, 457 S.E.2d 152 (1995) ...............................8, 9, 10

*Bazemore v Friday,*
   478 U.S. 385, 106 S. Ct.3000 (1986) ...........................................9

*Bird v Penn Cent Co.,*
   61 FRD 43 (E.D. Pa. 1973) .......................................................55

*Blankenship v Caterpillar Global Mining, LLC,*
   964 F. Supp. 578 (S.D. W.Va. 2013) .....................................45, 46

*Bragg v U.S.,*
   230 W.Va. 532, 741S.E.2d 90 (2013) .........................................19

*Burns v Texas City Refining*
   890 F2d 747 (5th Cir. 1989) ....................................................36

*Carefirst of Maryland, Inc. v Carefirst Pregnancy Centers,*
    334 F.3d 390 (4th Cir. 2003) ........................................................................49

*Carlile v. Farmers Ins. Exchange,*
    173 Cal. App. 3d 975, 219 Cal. Rptr. 773 (3rd Dist. App. 1985) ...............34

*Castleman v. Acme Boot Co*.,
    959 F.2d 1417 (7th Cir. 1992) .....................................................................7

*Chesapeake Bay Foundation, Inc. v Weyerhaeuser,*
    2014 WL 3747128 (4th Cir. 2014) ...............................................................29

*City of Ripley v. HRC,*
    179 W.Va. 375, 369 S.E.2d 226 (1988) ................................................. 37-38

*Conaway v. Eastern Associated Coal Corp.,*
    178 W.Va. 164, 358 S.E.2d 423 (1986),
    <u>mod'd by</u> *Barefoot v Sundale Nursing Home,*
    193 W.Va. 475, 457 S.E.2d 152 (1995) .......................................9, 10, 13, 14

*Constellium Rolled Products Ravenswood, LLC v. Griffith,*
    2014 WL 5315409 (W. Va. 2014)(Mem.).....................................................18

*Cook v. CSX Transp. Corp.,*
    988 F.2d 507 (4th Cir.1993) .......................................................................42

*Dartt v. Browning-Ferris Indus., Inc. (Mass.),*
    691 N.E.2d 526 (Mass 1998).......................................................................48

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579, 113 S. Ct. 2786 (1993) .........................................................24

*Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522,*
    657 F.3d 595 (7th Cir.2011) ........................................................................37

*Earl v. Nielsen Media Research, Inc*.,
    658 F.3d 1108 (9th Cir.2011).......................................................................48

*El-Meswari v. Washington Gas Light Co.,*
    785 F.2d 483 (4th Cir. 1986) ......................................................................17

*Evans v Technologies Applications & Serv. Co.,*
    890 F.3d 954 (4th Cir. 1996) ........................................................13

*Fairmont Specialty Services v WVHRC,*
    206 W.Va. 86, 522 S.E.2d 1890 (1999) ................................................*passim*

*Fourco Glass v. State HRC,*
    179 W.Va. 291, 367 S.E. 2d 760 (1988)(per curiam) ...........................38, 46

*Hamilton v. 1st Source Bank,*
    895 F.2d 159 (4th Cir. 1990) ...............................................47, 48

*Hanlon v. Chambers,*
    195 W.Va. 99, 464 S.E. 2d 741 (1995) ....................................10, 156, 18, 36

*Haynes v. Rhone-Poulenc, Inc.,*
    206 W.Va. 18, 521 S.E.2d 331 (1999) ...................................54, 56

*Holmgren v State Farm,*
    976 F.2d 573  (9th Cir. 1992) .............................................53, 56

*Hovermale v Berkely Springs Moose Lodge,*
    165 W.Va. 680, 271 S.E.2d 335 (1980) .......................................19

*In re A.H. Robins,*
    107 F.R.D. 2 (D. Kan 1985) ...............................................55

*In re Martin Marietta,*
    856 F.2d 619 (4th Cir. 1998) ...........................................52

*IntegraMed America, Inc. v. Patton,*
    2014 WL 1400786  (D.S.C.).................................................52

*Kline v. Tennessee Valley Authority,*
    128 F.3d 337 (6th Cir. 1997)...............................................7

*Koss v. Palmer Water Dept.,*
    2013 WL 5564474 (D. Mass)...............................................53

*Kronjaeger v Buckeye Union Ins Co.,*
  200 W.Va. 570, 490 S.E.2d 657 (1997) ...................................................33, 34

*Leake v. Ryan's Family Steakhouse,*
  5 Fed.Appx. 228 (4th Cir . 2001) ...................................................47

*Lewis v. UPMC Bedford,*
  2009 WL 840385 (D.C.W.D.Pa) ...................................................35

*Maher v. Continental Cas. Co.,*
  76 F.3d 535 (4th Cir. 1996) ...................................................16

*Martinez-Baez v. Rey-Hernandez,*
  394 F. Supp. 2d 428 (D.P. R.2005) ...................................................35

*Mayflower Vehicle Systems, Inc. v. Cheeks,*
  218 W.Va. 703, 629 S.E.2d 762 (2006) ...................................................36

*McCauley v Merrimac,*
  194 W.Va. 349, 460 S.E.2d 484 (1995) ...................................................14

*McDonnell Douglas v. Green,*
  411 U.S. 792, 93 S. Ct.1817 (1973) ...................................................8, 41

*Merritt v Old Dominion Freight Line,*
  601 F.3d 289 (4th Cir. 2010) ...................................................46

*Michael v Appalachian Heating, LLC,*
  701 S.E.2d 116 (W.Va. 2010) ...................................................4

*Montgomery General Hospital v. WVHRC,*
  176 W.Va. 580, 346 S.E. 2d 557(1986) ...................................................38

*Mordesovitch v Westfield Insurance,*
  244 F. Supp. 2d 636 (S.D.W.Va. 2003) ...................................................50, 51, 52

*Morrow v. Brown, Todd & Heyburn,*
  957 S.W.2d 722 (Ky. 1997)...................................................54

*Nestor v Bruce Hardwood LP,*
      210 W.Va. 692, 558 S.E.2d 691 (2001) .................................................10, 15

*PAR Elec. Contractors, Inc. v. Bevelle,*
      225 W.Va. 624, 695 S.E.2d 854 (2010) .......................................................18

*Piedmont Office Realty Trust, Inc. v. XL Speciality Ins. Co.,*
      769 F.3d 1291 (11th Cir. 2014) ....................................................................35

*Price Waterhouse  v Hopkins,*
      490 U.S. 228, 109 S. Ct. 1175 (1989) ...............................................14, 24, 25

*Reeves v. Sanderson Plumbing Products, Inc.,*
      530 U.S. 133, 120 S. Ct. 2097(2000) ..........................................................39

*Royal Surplus Lines Co. v Sofamor Danek Group,*
      190 F.R.D. 505 (WD Tenn. 1999).................................................................55

*St. Mary's Honor Ctr. v. Hicks,*
      509 U.S. 502, 113 S. Ct. 2742 (1993) ...........................................................9

*Scottsdale Ins. Co. v. Children's Home Soc.*
      2014 WL 4089347 (4th Cir. 2014) ...............................................................33

*Sewell v Gregory,*
      179 W.Va. 585, 371 S.E.2d 82 (1988) .........................................................19

*Sibley Memorial Hospital v. Wilson,*
      488 F.2d 1338 (D.C. Cir. 1973) ...................................................................35

*Shelley v. Kraemer,*
      334 U.S. 1, 13, 68 S. Ct. 836 (1948) .....................................................16, 31

*Skaggs. v. Elk Run Coal Co.,*
      198 W.Va. 51, 479 S.E.2d 561 (1996) ..............................................8, 36, 38

*Slivka v Camden-Clark Memorial Hospital,*
      215 W.Va. 109, 594 S.E.2d 616 (2004) .........................................................6

*Smith v. Sears, Roebuck and Co.,*
    205 W.Va. 64, 516 S.E.2d 275 (1999) ..........................................................14

*State ex rel. Erie Ins. Property &Cas. Co. v. Mazzone,*
    220 W.Va. 525, 648 S.E.2d 3 (2007) ...............................................24, 52, 55

*State ex rel Montpelier v Wolloitz,*
    2014 WL 1408487 (WV 2014)......................................................................51

*State ex. rel. United States Fidelity and Guar. Co. v. Canady,*
    194 W.Va. 431, 460 S.E.2d 677 (1995) .........................................................50

*State ex rel United Hospital v Bedell,*
    199 W.Va 316, 484 S.E.2d 199 (1997) ..........................................................55

*State ex rel. Westbrook Health Services, Inc. v. Hill,*
    209 W.Va. 668, 550 S.E.2d 646 (2001) .........................................................51

*State v Burton,*
    163 W.Va. 40, 254 S.E.2d 129 (1979) ...........................................................51

*State v. Logan-Mingo Mental Health Agency,*
    174 W.Va. 711, 329 S.E. 2d 77 (1985) .....................................................38, 39

*State v. McKinley,*
    764 S.E.2d 303, 311 (W.Va. 2014) ................................................................14

*Stiles v. Gen. Elec. Co,*
    986 F.2d 1415 (Table), 1993 WL 46889 (4th Cir. 1993) .........................47, 48

*Texas Dept. of Community Affairs v. Burdine,*
    450 U.S. 248, 101 S. Ct. 1089 (1981) .........................................................8, 36

*Turner v. Rogers,*
    131 S. Ct. 2507 (2011)...................................................................................16

*TWA, Inc. v. Thurston,*
    469 U.S. 111, 105 S. Ct. 613 (1985) ...............................................................8

*United States v. (Under Seal),*
    748 F.2d 871 (4th Cir.1984) ................................................................. 56-57

*Vaughan v. Metrahealth,*
    145 F.3d 197 (4th Cir.1998) ...................................................................47

*West Virginia Human Rights Commission v Wilson Estates,* 7
    202 W.Va. 152, 503 S.E.2d 6 (1988) ...........................................................37

*Williams v Precision Coil, Inc.,*
    194 W.Va. 52, 459 S.E.2d 329 (1995) .................................................... 36-37

*Williams v. Staples, Inc.,*
    372 F.3d 662 (4th Cir. 2004) ..............................................................37, 39

**Statutes:**

*42 USC § 1981* .......................................................................................8, 42

*28 USC § 1291* .......................................................................................1, 35

*28 USC § 1332* ...........................................................................................1

*28 USC § 1441* ...........................................................................................1

*29 USC § 1983* ...........................................................................................3

*West Virginia Human Rights Act, 5-11-1 et seq.* ........................................... *passim*

*West Virginia Unfair Trade Practices, 33-11-4 (9)(n)* ...........................................46

*West Virginia Uniform Declaratory Judgment Act, 55-13-1 et seq.* ........................4

**Rule:**

*Fed. R. App. p. 4(A)(1)* ................................................................................1

***Other Sources:***

"The Vanishing Trial,"
      BUSINESS WEEK, 4/30/07, www.businessweek.com ............................ 6, 7

Butler, *The Case for Trials, Considering the Intangibles*,
      I JOURNAL OF EMPIRICAL  LEGAL STUDIES
      No. 3, 627-636 (November, 2004) ............................................ 6, 7

Boston Bar Assn. Task Force on the Vanishing Trial,
      JURY TRIAL TRENDS IN MASSACHUSETTS:
      THE NEED TO ENSURE JURY TRIAL COMPETENCY
      AMONG PRACTICING ATTORNEYS AS A RESULT
      OF THE VANISHING JURY TRIAL PHENOMENON (2006) .............. 6-7

Defense Research Institute Jury Preservation Task Force,
      *Ongoing Efforts to Preserve Our  Unique Right,*
       available at www.butlerpappas.com ............................................ 7

Edna Epstein, THE ATTORNEY CLIENT PRIVILEGE
      AND THE WORK-PRODUCT DOCTRINE (5th ed.) ........................... 53, 55

Marc Galanter, *The Vanishing Trial: An Examination of Trials*
       *and Related Matters in Federal and State Courts,* 1
      JOURNAL OF EMPIRICAL LEGAL STUDIES No. 3,
      459-570 (Nov. 2004) ...................................................................... 7

Paul W. Mollica, *Federal Summary Judgment At High Tide,*
       www.scholarship.marquette.edu ..................................................... 6

Prosser, LAW OF TORTS (4th ed.) ...................................................... 22

Validity, Construction, and Effect of No-Consent-to-Settlement Exclusion
      Clauses in Auto Insurance Policies, 18 ALR 4th 249 .................................. 34

Patricia M. Wald, *Summary Judgment at Sixty,*
      76 TEX. L. REV. 1897 (1998) ...................................................... 6

10B Wright, Miller & Kane,
      FEDERAL PRACTICE & PROCEDURE, Civil, 3d,  ¶ 2730 .................... 37

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this action under *28 USC § §1332* and *1441* The district court entered the appealed judgment in favor of Defendant ("Scottsdale" or "Insurance Company") on 12/16/2014 after it issued summary judgment in its favor, JA 727-767. Plaintiff Estate filed its notice of appeal on 12/31/2014, *id.* 768-771, and an amended notice of appeal on 1/12/2015, *id.* 772-775. The appeal was timely, *Fed. R. App. p. 4(A)(1)*, and this court has jurisdiction under *28 USC § 1291*.

## ISSUES PRESENTED

The Estate of Joe Porter alleged that Defendant Insurance Company violated the *West Virginia Human Rights Act, 5-11-1 et seq.* (*HRA*), by aiding and abetting the City of Huntington (City), which refused to settle in a case that the Estate brought in the Southern District of West Virginia. Scottsdale had actual or constructive notice of racial animus on the part of the City, particularly regarding Joe Porter and his family.

Accordingly, the issues are:

(1)     Did the district court err in concluding, as a matter of law, that "no duty is imposed on Scottsdale to investigate whether race played role in the City's refusal to give its consent to settle." JA 747

1

(2)    Did the district court err in finding as a matter of law that whether the employees of "Scottsdale did or did not know about any incidents of racial animus proves immaterial because Scottsdale did not have a duty to investigate those allegations as to why the City did not settle." *Id.* 751

(3)    Did the district court err in finding that no material facts were in dispute and Scottsdale was entitled to summary judgment as a matter of law?

(4)    Did the district court err in preventing the Estate from getting access to documents in the claim file in the underlying case JA 53-82, 85-92, even though those documents were "directly at issue" regarding the claims raised in the current case, on the basis of work product and attorney-client privilege?

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND

### A.    The parties

Appellant is the Estate (also referred to here as Plaintiff) of Joe Porter (Porter), a black man shot and killed on 11/11/2009 by a white officer (Ronnie Lusk) employed by the Huntington Police Department (HPD) and working for the City in a bar frequented largely by other Afro-Americans. Lusk and other officers, generally white officers, were responding to a shooting incident in which Porter had not been

involved. While his arrests had been minor, Porter and HPD had a history of unpleasant interactions with racial aspects. Those interactions survived the death of Porter.

The Estate filed suit in the Southern District of West Virginia ("underlying case") on 6/1/2010, by Latoya Hackett and Betty Jo Radford, previous co-administrators of the Estate. In this litigation, Plaintiffs pointed to incidents involving other blacks in Huntington, some of them involving Porter's relatives, JA 27-9 (Complaint), along with discrepancies in the City's story. *Id.* 145-163.

Appellee insured the City, and its employees, such as Lusk. Appellee Scottsdale made no response to claims of racial discrimination, which ███████████ ████████████ and were brought to Scottsdale's attention and inserted into the Claim File that Scottsdale created for this claim

### B.    The Underlying Case In The Southern District Of West Virginia

This case arose initially from the failure of Defendant to respond to settlement demands in 2/2012 or evaluate fairly claims raised in the underlying case. Defendant did not even respond to these inquiries by counsel, JA 762-3.

Additional to a claim under *29 USC § 1983,* the underlying case against the HPD and the police officer alleged negligence and wrongful death, JA 133-7. This case partially survived summary judgment and went to trial, where the jury returned a verdict in favor of these defendants, JA 239-40. This Court affirmed.

3

**C.**    **The Case Appealed From In The Northern District Of West Virginia**

During the pendency of the underlying case, the Estate filed suit on 5/10/2012 in the Circuit Court of Ohio County against Scottsdale, alleging that the Insurance Company aided and abetted the City in failing to evaluate fairly the claims asserted in the underlying case, in violation of *Michael v Appalachian Heating, LLC*, 701 S.E.2d 116 (W.Va. 2010), JA 25-32. The district court admitted that the *HRA, 5-11-9(7)(A)(3),* prohibits aiding and abetting racial discrimination, JA 740.

After removal, a sister insurance company was dismissed. After the underlying case went to verdict and was affirmed by this Court, a stay in the case at bar was lifted. After denying Defendant's motion for change of venue, 2013 WL 6230455, the trial court dismissed one count brought under the *West Virginia Uniform Declaratory Judgment Act, 55-13-1 et seq.,* for lack of standing, 2014 WL 235520, ECF 67.

Scottsdale and the district court relied entirely upon a consent to settle clause in its policy with the City, JA 125. The district court required Plaintiff to prove that this consent to settle provision was negotiated for a racial purpose at the time the policy was first sold to the City. There was no evidence adduced regarding when or how that policy provision appeared. Neither party raised this as an issue.

4

In discovery, the Estate received a portion of the Claim File opened in the underlying case. Plaintiff extracted material from the Claim File and attached it to the Estate's opposition to the Scottsdale summary judgment motion. The Estate received a Privilege Log for the rest of the file, JA 998-1006. Beyond providing a direct conflict with testimony of a Scottsdale employee, *infra* at VII F, that log showed that over nineteen months elapsed after suit was filed that the issue of consent first arose. Reference to the City's consent to settle first appeared on 1/26/2012. *Infra* at VIII.

The Scottsdale Claim File helps show how race appeared in the underlying case. A tangible example appeared in handwriting on a document in the Claim file. In writing, that those from Scottsdale refused to claim, the notation emphasized information about Porter that correlates with race, JA 1062. Also, a motion in limine (MIL) in the underlying case, submitted to Scottsdale by counsel it hired, raises racial issues. This MIL, JA 966, similarly alerted Scottsdale to race in the underlying case, *id.* 984, purporting to summarize testimony.

While the trial court was required to resolve all doubts against the insurer, its lengthy opinion shows signs that this was not how the court viewed the case. It repeated that it had difficulty understanding the Estate's case, e.g. "as this court understands the Plaintiffs arguments" *id.* 751. It accused the Estate of misquoting and **misinterpreting** evidence, *id.* 752-3.

Summary judgment is more often granted in discrimination cases in Federal Court, but remains more rarely granted in state cases, and where granted often overturned. e.g. *Slivka v Camden-Clark Memorial Hospital*, 215 W.Va. 109, 594 S.E.2d 616 (2004), indicating that summary judgment was inappropriate. <u>See also</u> Patricia M. Wald, Summary Judgment at Sixty, 76 TEX. L. REV. 1897, 1935 (1998)("Its flame lit by *Matshusita, Anderson* and *Celotex* in 1986, and fueled by overloaded dockets of the last two (2) decades, summary judgment has spread swiftly through the underbrush of undesirable cases, taking down some healthy trees as it goes"). From 1972 to 1999, the number of federal trials dropped (despite an increase in the number of cases) from about eight thousand (8000) to about six thousand (6000). Increased use of summary judgment provided a key factor. Paul W. Mollica, *Federal Summary Judgment At High Tide*, www.scholarship.marquette.edu, accessed 2/12/2012.

> "After peaking at twelve thousand eighteen (12,018) in 1984, the number of civil trials in all federal district courts has dropped precipitously, reaching a new low of three thousand five hundred fifty-five (3,555) last year. That's almost half the number of federal trials that took place forty (40) years ago, even though the number of suits filed during the same period soared from sixty-six thousand one hundred forty-four (66,144) to two hundred fifty-nine thousand five hundred forty-one (259,541)."

"*The Vanishing Trial,*" Business Week, 4/30/07, www.businessweek.com, accessed 2/17/12. <u>See</u> <u>generally</u> Butler, The Case for Trials, Considering the Intangibles, I JOURNAL OF EMPIRICAL LEGAL STUDIES No. 3, 627-636 (11/2004); Boston

Bar Assn. Task Force on the Vanishing Trial, JURY TRIAL TRENDS IN MASSACHUSETTS: THE NEED TO ENSURE JURY TRIAL COMPETENCY AMONG PRACTICING ATTORNEYS AS A RESULT OF THE VANISHING JURY TRIAL PHENOMENON (2006)("Jury trials on the federal side, if not vanishing, are certainly declining markedly." p. 6); Marc Galanter, The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES No. 3, 459-570 (Nov. 2004). The Defense Research Institute established a Jury Preservation Task Force. See *Ongoing Efforts to Preserve Our Unique Right,* available at www.butlerpappas.com, accessed 1/21/15.

Plaintiffs such as the Estate can prove discriminatory animus two ways. One is directly, e.g. here if a Scottsdale employee noted that, since the witnesses for decedent typically were black and that those supporting the shooter were white, that suggested that therefore this case is virtually worthless because the jury, projected to be white, would be likely to discredit such black witnesses.

No such statements appear from the claim file as provided. "An employer, of course, does not normally memorialize an intention to discriminate." *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1420 (7th Cir. 1992); "It is the rare situation when direct evidence of discrimination is readily available." *Kline v. Tennessee Valley Authority,* 128 F.3d 337, 348 (6th Cir. 1997).

7

However, Scottsdale withheld over 1/5[th] of the claim file, claiming that it is protected by attorney-client privilege or work product exception. *Infra* at VIII we show this is error.

Plaintiffs made a *prima facie* case by the inferential method of proof outlined in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S. Ct.1817 (1973). This burden-shifting mechanism is intended to assure that the "Plaintiff [has] his day in court despite the unavailability of direct evidence." *Skaggs. v. Elk Run Coal Co.,* 198 W.Va. 51, 479 S.E.2d 561 (1996), quoting *TWA, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 622 (1985).

Porter's complaint cited racial aspects of the underlying case. As well, he pointed to racial aspects of the claim file, even as withheld. Thus, Porter created an inference or rebuttable presumption of discrimination by establishing a *prima facie* case. See *Barefoot v Sundale Nursing Home,* 193 W.Va. 475, 483, 457 S.E.2d 152, 160 (1995). The burden of production then shifted to Scottsdale to produce a legitimate, nondiscriminatory reason for failing to respond. See *Id; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089 (1981); and *McDonnell-Douglas,* 416 U.S. at 802, 93 S. Ct. at 1824. It deferred utterly to the consent to settle provision, despite knowledge that the City expressed racial hostility. *Infra* at VII.

Once the employer meets this burden of production, the presumption raised by the prima facie case is rebutted. "[T]he factual inquiry proceeds to a new level of specificity." *Burdine* at 255, 101 S. Ct., at 1095, <u>cited in</u> *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516, 113 S. Ct. 2742, 2752 (1993). During this third step of the proof process, Porter can show by a mere preponderance of the evidence that the Defendant's proffered reason is a pretext rather than the true reason for the failure to make an offer in response to the written demands. Syl. Pt. 4, *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986), <u>mod'd on other grounds</u> *Barefoot,* 193 W.Va. at 487, 457 S.E.2d at 161 and 164, n 18. Porter need show no "more than the articulated reasons were implausible" *Barefoot,* Syl. Pt. 5. <u>See</u> *Bazemore v Friday*, 478 U.S. 385, 400, 106 S. Ct.3000 (1986)(the Estate need not prove discrimination with scientific scrutiny).

While Scottsdale relies upon the proposition that no one has the right to a settlement offer, *Michael* articulates a right to an unbiased evaluation of their claim. Thus, the ultimate question involves whether Scottsdale evaluated the underlying case without consideration of race, or otherwise aided and abetted the City, constituting unlawful discrimination under the *WVHRA*.

## II.    RULINGS PRESENTED FOR REVIEW

The district court, over specific objection, denied the Estate's motion to compel and affirmed the decision of the Magistrate to deny portions of the Scottsdale claim file. *Infra* at VIII

The district court granted summary judgment. JA 727, 2014 WL 7183865.

## <u>SUMMARY OF ARGUMENT</u>

The district court applied an erroneous evidentiary standard to the prejudice of the Estate. This was a but-for standard repeated at JA 734, 741, 743-4, 751, which has been replaced by a standard more favorable to the Estate, *infra* at II, <u>citing</u> *Barefoot v Sundale Nursing Home,* 193 W.Va. at 483, 457 S.E.2d at 161, 164, n 18, <u>modifying</u> *Conaway v. Eastern Associated Coal Corp*., 178 W.Va. 164, 358 S.E.2d 423 (1986).

The district court, claiming to apply West Virginia law in this diversity case, violated crucial, long-standing state principles of discrimination law in its granting of summary judgment to Defendant Scottsdale. II, V, *infra*, <u>citing</u> *Nestor v Bruce Hardwood* LP, 210 W.Va. 692, 558 S.E.2d 691, 694 (2001), <u>quoting</u> Syl. Pt. 4, in part, *Hanlon v. Chambers*, 195 W.Va. 99, 464 S.E. 2d 741 (1995) <u>and</u> *Williams v Precision Coil,* 194 W.Va. 52, 459 S.E.2d 329 (1995).

The district court also resolved factual discrepancies, among them crediting the testimony of the chief adjuster, Gwen Aliotta, whose testimony was seriously compromised, analyzed *infra* at VI C.

The district court erred in finding no duty by Scottsdale to investigate why the City refused to consent to an offer, JA 727, 749, 751. The duty comes from Scottsdale's claim to have investigated the claim, and the adjuster's supervisor testimony that if it was a case whether Scottsdale wanted to make an offer, its practice was for defense counsel to have a discussion with the insured about why consent was refused, *id.* 613-4. The duty comes as well from Fairmont *Specialty Services v WVHRC,* 206 W.Va. 86, 522 S.E.2d 1890 (1999). It requires an investigation upon receiving the kind of notice that Scottsdale received here, including two letters from Plaintiffs' counsel. By ignoring the existence of *Fairmon*t, the district court narrowed *Michael* and essentially applied *Michael* only to property damage cases of undisputed liability, JA 749-50.

The district court erred in ignoring the options that Scottsdale could have performed, *infra* at V, and which were pointed out to the district court, in part by Dr. Tim Berard, *infra* at VIA, instead finding that a consent to settle provision permitted Scottsdale to do nothing, despite at least constructive knowledge of racial animus by the City. VI A-F, *infra*

11

The district court erred by applying a credibility test to the testimony of Berard and indicating that he failed it, JA 753-58.

The district court erred in requiring that evidence showing deviations from normal practice to have been caused by animus, rather than creating an inference of animus. A key deviation, *infra* at VIII E, to which Berard pointed involves the lack of response to Plaintiffs' counsel's letters, JA 762-3. Scottsdale Insurance Company Guidelines say that adjusters have a duty to act in good faith, to respond, *id.* 430-1. Berard's testimony, to a legal obligation, and company policy, requiring a reply, *id.* 447-8, was confirmed by company witnesses. An adjuster chiefly handling the claim admitted a duty to respond, *id.* 475, 561-2. The adjuster previously handling the claim conceded that Scottsdale policy contemplated a response within a reasonable period of time, *id.* 213-4. Their boss, Windsor, confirmed that she would have expected there to be a response, *id.* 651-52. Contrary to the district court, *id.* 727. Aliotta testified that the duty to respond was not relieved by the City's failure to consent, *id.* 561:6-562:5.

The district court erred where it relied in part upon Plaintiff's failing to demonstrate that the original insertion of the consent clause came from discriminatory animus, JA 751, an argument not raised by either party and upon which no discovery occurred. *Infra* at III.

12

These errors occurred following an earlier error. The district court, affirming the magistrate, prevented Plaintiffs from receiving documents that were directly at issue to the mental state of the adjusters, relying exclusively on Plaintiffs not bringing a first-person bad faith claim, JA 53-82, 85-91, addressed *infra* at VIII.

## ARGUMENT

### THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST THE ESTATE

### I.    THE STANDARD OF REVIEW IS DE NOVO

"This court reviews the district court's grant of summary judgment *de novo*, applying the same legal standard as the district court and viewing the facts and inferences drawn from the facts in the light most favorable to the nonmoving party." *Evans v Technologies Applications & Serv. Co.*, 890 F.3d 954, 958 (4th Cir. 1996).

### II.   THE COURT ERRED WHEN IT REQUIRED BUT-FOR CAUSATION, RELYING UPON SUPERSEDED WEST VIRGINIA CASE LAW

The standard applied by the district court deviates from the proper causation standard under the *HRA, §5-11-9.* Dismissing the case, the district court required the Estate to show but-for causation, JA 727, as more than a threshold inquiry, citing *Inter Alia Conaway v. Eastern Associated Coal Corp*., 178 W.Va. 164, 358 S.E.2d 423 (1986), mod'd by *Barefoot,* 193 W.Va. at 483, 457 S.E.2d at 164 n 18. "[T]he plaintiff is not required to show that the Defendant's proferred reasons were false or played no role but only that they were not the only reasons and the prohibited factor

13

was at least one of the 'motivating' reasons." *Barefoot* <u>at</u> *id*, <u>citing</u> *Price Waterhouse*

*v Hopkins*, 490 U.S. 228, 109 S. Ct. 1175 (1989)(plurality opinion). Nonetheless, the

district court cited *Barefoot*, finding that "as is often the case in WVHRA, the 'but-

for' test proves the most challenging," JA 743. *Barefoot*, at the location cited by the

district court stated, "we now hold the 'but-for' test of discriminatory motive in

*Conaway* is merely a threshold inquiry, requiring **only** that a plaintiff show an

inference of discrimination." 193 W.Va. 475, 457 S.E. 2d at 161. The district court

also erred by applying the but-for test beyond the *prima facie* case, JA 751.

    While the district court also cited *Smith v. Sears, Roebuck and Co.,* 205 W.Va.

64, 516 S.E.2d 275, 279 (1999), and *McCauley v Merrimac*, 194 W.Va. 349, 460

S.E.2d 484 (1995), JA 741, these per curiam cases did not overrule the signed,

precedential opinion in *Barefoot*. <u>Cf</u> *State v. McKinley,* 764 S.E.2d 303, 311 (W.Va.

2014)(citation omitted)("Per curiam opinions have precedential value as an

application of settled principles of law to facts necessarily differing from those at

issue in signed opinions"). The district court took the "sufficiently link" language of

*Conaway* and *Smith*, e.g. JA 750, requiring a link between protected status and

adverse action, *as* license to decide credibility issues, as set forth *infra*.    For

one example, the district court accused plaintiffs' counsel of misquoting and

misinterpreting the former Mayor's testimony, JA 747. The very term

"misinterpreting" suggests that that the district court engaged in fact-finding.

## III. THIS COURT SHOULD REVERSE BECAUSE THE DISTRICT COURT FAILED TO FOLLOW WEST VIRGINIA LAW MAKING A PRIMA FACIE CASE A *DE MINIMIS* BURDEN WHEN IT FOUND THAT THE ESTATE DID NOT ESTABLISH A PRIMA FACIE CASE

While the district court also found that, if a *prima facie* case had been made, it had been rebutted, JA 758-764, the court applied erroneous law on whether that *prima facie* case had been made, *id* 727. It did not apply West Virginia law about the burden on a Plaintiff in a claim under the *West Virginia Human Rights Act*. "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment *is de minimis*." e.g. *Blankenship v Caterpillar Global Mining, LLC.*, 964 F.Supp.578, 585 (S.D. W.Va. 2013), denying summary judgment, citing *Nestor v Bruce Hardwood LP*, 210 W.Va. 692, 558 S.E.2d 691, 694 (2001), quoting Syl. Pt. 4, in part, *Hanlon v. Chambers,* 195 W.Va. 99, 464 S.E. 2d 741 (1995). Since the district court went further and purported to consider the pretext step of the analysis, the Estate will as well.

## IV. THIS COURT SHOULD REVERSE BECAUSE THE DISTRICT COURT SET A BAR FOR THE ESTATE HIGHER THAN WEST VIRGINIA LAW ALLOWS BY RAISING AND RULING ON AN ISSUE NOT RAISED BY ANY OF THE PARTIES

The district court stated:

"Further, as this Court understands the Plaintiffs' arguments, the Plaintiffs also fail to show how any of Scottsdale's employees **included the consent to settle claims in the insurance policy in order to aid and abet the City in its alleged acts of unlawful discrimination.**

JA 751(emphasis herein added unless indicated).

No discovery occurred on either City or Insurer motivation for including a consent clause in the insurance policy. The parties' initial disclosures, for example, provided no information about that process, nor even how long ago the policy was purchased. A court should not base its decision on a reason raised by neither party. *Turner v. Rogers,* 131 S. Ct. 2507, 2254 (2011) (Thomas, J., dissenting)(reason raised only by amicus).

This requirement by the district court offends the rule that entities such as the City cannot make agreements that permit them to evade laws like the *HRA* <u>See generally</u> *Shelley v Kramer,* 338 US 1, 68 S.Ct 836 (1948), refusing to enforce a discriminatory restrictive covenant in a deed.

Contrary to the district court, the crucial measuring time occurred not when the insurance policy was purchased but the interval from the filing of the complaint in the underlying case, 5/1/10, JA 133 until jury verdict over two years later, JA 224, 239 (denying Summary Judgment), *Maher v. Continental Cas. Co.,* 76 F.3d 535, 544 (4th Cir.1996).

## V.    THIS COURT SHOULD REVERSE BECAUSE THE DISTRICT COURT MISUNDERSTOOD WEST VIRGINIA LAW ON THE DUTY TO INVESTIGATE

Narrowing *Michael,* the district court concluded that "no duty is imposed on Scottsdale to investigate whether race played role in the City's refusal to give its consent to settle" JA 747. It found as well that whether the employees of "Scottsdale

16

did or did not know about any incidents of racial animus proves immaterial because Scottsdale did not have a duty to investigate those allegations as to why the City did not settle." *Id.* 751.

Another conclusion was that *Michael* imposes no duty to investigate whether race played a role in the City's refusal *id.* 749, 751. "[Michael] does not create the duty that the plaintiffs claim that Scottsdale breached. At most, Michael simply recognizes the plaintiff's cause of action." *Id* 750.

The district court did not distinguish *Michael*, as it claimed, JA 749-50, but limited it, something not its proper function. "[T]he duty of a federal court in diversity jurisdiction is to apply the expressed law" of the state. *El-Meswari v. Washington Gas Light Co.,* 785 F.2d 483, 489 (4th Cir. 1986).

A. ***Michael*** **and** ***Fairmont Specialty*** **provide the duty**

As Plaintiffs argued, *Michael* together with *Fairmont Specialty,* 206 W.Va. at 95-6, 522 S.E.2d at 189-90, provides such a duty. Despite the Estate's heavy reliance upon *Fairmont Specialty*, the district court did not even cite a lead West Virginia case on the existence and scope of the duty to inquire into claims of discrimination.

*Fairmont Specialty* states that the adequacy of the response is typically:

> a legal conclusion inextricably bound to the facts, for it is only the context of a close and detailed review of all the facts and circumstances of the case that the adequacy of [a] response can be determined.

206 W.Va. at 95, 522 S.E.2d at 189.

17

As *Fairmont Specialty* indicates, the adequacy of the response to complaints of discrimination is typically a "legal conclusion **inextricably bound to the facts,** for it is only in the context of a close and detailed review of all the facts and circumstances of the case that the adequacy of [a] response can be determined." 206 W.Va. at 95, 522 S.E.2d at 189. This helps makes this case within the province of the jury since the Estate has pointed a set of reasonable responses that Scottsdale could have made. VI A, *infra.* See *Fairmont Specialty*, requiring the court to look at the "options" available to the defendant. 206 W.Va. at 96, 522 S.E.2d at 90.

Instead, the district court ignored the options pointed out, and Scottsdale made no response whatsoever to the letters of the Estate, JA 762-3.

*Fairmont Specialty* re-affirms the test is whether Scottsdale knew or had reason to know of the City's racial animus. *Id*, citing *Hanlon v. Chambers*, 195 W.Va. at 108, 464 S.E. 2d at 750. See *Constellium Rolled Products Ravenswood, LLC v. Griffith*, 2014 WL 5315409 (W. Va. 2014)(Mem.), affirming jury verdict in part upon *Fairmont Specialty* and *PAR Elec. Contractors, Inc. v. Bevelle* 225 W.Va. 624, 625, 695 S.E.2d 854, 855 (2010)(per curiam), also applying *Fairmont Specialty.*

Scottsdale was put on notice that this underlying case showed racial elements, e.g. by documents that have exhibits to deposition of Aliotta, JA 480-600. That notice triggered a duty to investigate. 206 W.Va. at 97, 522 S.E.2d at 191 ("after being placed on notice, their investigation was not sufficient and their response was ineffective").

Some of Scottsdale's actions were affirmative, e.g. giving much more weight to the police officers. Berard stated that the insurance review seemed to only consider police testimony, *id.* 414:14-21. Virtually every participant or witness on Porter's side was black and described as such to the insurer.

### B.     Other Sources Confirm Scottsdale's Duty to Investigate

Finding a duty analogous that denied here by the district court, the West Virginia Supreme Court of Appeals, answering a certified question from this Court, found that a mine inspector owed a duty of care to a coal miner, such that the federal government could be liable to the estate of a miner who alleged that he was killed as a result of the breach of that duty. *Bragg v U.S.*, 230 W.Va. 532, 741S.E.2d 90 (2013), Syl. Pt. 3 <u>citing</u> Syl. Pt. 3, *Sewell v Gregory*, 179 W.Va. 585, 371 S.E.2d 82 (1988).

Even apart from the narrowing of *Michael* that occurred here, a test of the existence of a duty is notice. *Hovermale v Berkeley Springs Moose Lodge*, 165 W.Va. 680, 271 S.E.2d 335 (1980). Aliotta repeatedly testified that she "took everything in the claim file into consideration," JA 489-90, 534, 555, as did her boss, Bonnie Windsor, JA 612, 635. Aliotta "would want to know everything" about the underlying case. *Id* 514:1, 509 ("I want to know everything.")

### C.      Head in the Sand and Purposeful Ignorance by Scottsdale

That Aliotta, like others at Scottsdale, kept her head in the sand and refused to see any racial aspects appear when she was referred to allegations of racial animus, e.g. *id.* 541:1-3, 514:16-22, even when apprised of racial allegations by the counsel Scottsdale was paying, *id* 506-7.

Particularly significant to the issue of whether or not the case was "racially charged," and whether improper racial considerations were involved in the City's refusal to give "consent" to settle the case, was evidence used as exhibits in the deposition of Adjuster Aliotta. This evidence indicated historical specific racial animus against Porter and his family (use of the "n" word) by more than one member of HPD, as well as harassment of another family member, Latoya Hackett, one of the initial Administrators of the Estate. Police used the "n word" toward Porter. Aliotta admitted that this would be something she'd want to know. JA 510.

They used it at a post-shooting celebration of Joe's life, *id.* 27-8, 512:2-13. One of the representatives of the Estate was cornered by police cars at an ATM, *id.* 14-22. Police also stationed themselves outside Joe's mother's house, watching it, after the shooting, *id.* 513:18-24. Aliotta said these would not raise any concerns with her, *id.* 514:16-22.

20

With inconsistency helping to defeat the summary judgment motion, Aliotta stated that some of those same elements would raise the possibility of racial overtones, *id.* 475, 542-3. These provide record elements suggesting racial prejudice by the City Dep. 137-138. As indicated, it was alluded to in documents IN THE CLAIM FILE, JA 1071, 27-9. Contrary to the finding of the district court, this amounts to evidence of racial animus on the part of the City.

Since there was a reason to know, and no inquiry at all, according to depositions of adjusters and others involved in the Claim File, the record provided no basis to grant summary judgment in favor of Scottsdale.

Despite lack of any contrary evidence, the district court referred to these as "alleged incidents," JA 732, contrary to the rule that evidence should be construed most favorably to the non-moving party, here the Estate, a standard that the district court claimed to apply.

Aliotta also stated that a reference to the Porter organization would bear on the issue of animosity, JA 48-55, 517-8. Yet she inexplicably did not know if the fact that HPD sent out evidence regarding "The Porter Organization" would bear on animosity, *id.* 519:15-24.

Contrary to Windsor, Aliotta did not believe that this was a racially charged case or a case with racial overtones, *id.* 484:11-24. Showing that she never saw any racial overtones. Aliotta did not believe there were any racial overtones in the O.J.

Simpson case. *Id.* 497:20, 498:23, 499:20-1. Since she did **not** state that she couldn't recall enough about the case to form a perception, either her recall was faulty or her perception deviated wildly from the national perception of that case.

> **D.** **Even Apart From West Virginia Case Law, The Claims Adjuster Admitted A Duty To Investigate The Claim Fairly And Her Boss A Duty To Consider Claims of Racial Animus**

Directly contradicting the district court finding of a lack of duty to investigate, Windsor testified that, if it was a case whether Scottsdale wanted to make an offer, its practice was for defense counsel to have a discussion with the insured about why consent was refused, JA 615. The record shows no evidence of any such discussion and the trial court blocked access to any discussions involving defense counsel. We demonstrate that this was error, *infra* at VIII as error, *infra* at VIII Also, Aliotta's boss confirmed that Scottsdale did care "about why" the insured was refusing consent. *Id.* 615:3-4.

Even if there were no duty to investigate, it was a duty assumed by Scottsdale. Windsor, unlike Aliotta, was aware of allegations of "racial animus or of there being a racial component to this case. We were looking at those things." 617:5-15. See Prosser, LAW OF TORTS (4th ed.), Ch. 9, 344-5 ("This idea of voluntary assumption of a duty by affirmative conduct runs through a variety of cases very little extra is required for assumption of the duty" (citations omitted)).

22

An additional source comes from the insurer's admitted duty to evaluate the claim brought in by the underlying case. Aliotta admitted that Scottsdale and the City had the duty to evaluate the claim free of racial prejudice. JA 556:5-13.

### E.    Berard Also Located the Duty To Investigate

The district court also erroneously found that Plaintiffs had not demonstrated that Scottsdale refrained from failing to investigate instances of racial animus because the Plaintiffs or the decedent are Afro-Americans. *Id*. 752. Dr. Berard testified that Scottsdale violated its duty to see whether complaints of racial bias in the handling of the claim were adequately investigated, and that its lack "was a crucial causal link." *Id.* 459:15-6. He stated that a full professional evaluation was required, *id.* 460:4-8, citing Scottsdale policies. *Id.* 463:16-20.

The trial court objected to Berard's opinion being conditional but that misstates the tenor of his opinion:

> "I cannot conclude authoritatively that Mr. Porter's race was the cause of lack of meaningful review **but there is lots of evidence that multiple employees** were racially insensitive, were overly deferential to other people, **did not conduct a proper investigation."**

*Id.* 393:19-394:2

In another important qualification, he acknowledged a lack of "**conclusive** evidence." *Id.* 456:10-12.

23

In *Price Waterhouse v Hopkins*, the Supreme Court noted the testimony of a social psychologist, Susan Fiske, with credentials similar to the Estate's expert here. Where Fiske was connected to Carnegie-Mellon University, Berard was connected to the premier printing house in the world, Oxford Press. JA 473:6-14. A Ph.D. from Boston University, Berard taught subjects at Kent State relating directly to the issues in this case. JA 46-7.

Fiske testified that she discerned sex stereotyping in the partners' evaluations of a partnership candidate, Ann Hopkins. The trial court's reliance here upon Berard's lack of insurance experience, *Id.* 755, would have eliminated evidence from Fiske in *Hopkins*. It found that sociological evidence can be a crucial method of proving discrimination.

The district court, presented with a motion under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993), did not rule, but did not credit his testimony either, complaining that "his conclusions are based on assumptions of unverified facts that are necessary to prove a prima facie case." *Id.* 756. It also complained that his opinion was based upon "facts whose existence he cannot verify." *Id.* 756. This suggests that, for summary judgment purposes, facts must be "verified." See also III, noting that the district court applied a too-high requirement.

24

To the contrary, Berard's report sketches out the facts providing a "reason to know" by Scottsdale that race was a factor, and relied upon facts in the claim file and depositions.

First, the claim file contains many examples of conduct consistent with racism. Berard reviewed claim file, as provided, *Id.* 331:15-6, 24. Aliotta saw these letters. *Id.* 552-3.

Also showing the basis for his opinion, Berard reviewed depositions and paper discovery; Scottsdale Claim Operations Handling Standards; the Privilege Log for Scottsdale in this case; *Fairmount Specialties*; the Answer in the underlying case; *WV Code 5-11-9*; a report of Scottsdale's insurance expert John Murphy, which provided the reasoning inquired about in Plaintiff's discovery, yielding the statistical evidence, which Berard also reviewed and the trial court criticized; former Mayor Roger Wolfe's deposition transcript; and an excerpt from *Hopkins v. Price Waterhouse*. JA 331-342.

Berard concluded that, if the City did harbor racial prejudice or stereotyping towards the Porter family, or otherwise held racial considerations against the Porter family and its interests, to a reasonable degree of sociological probability, this would likely have affected the decision of the City to give a consent to settle. *Id.* 753-56.

Another "non-conclusory" basis for his opinion came from the deposition of former Mayor Wolfe, which to Berard showed a lack of discussion about the merits of the case and clear deference to the police chief, constituting a lack of any meaningful review. Berard recorded significant inconsistency in reported judgments on the chance that Plaintiffs in the underlying case might be successful. The claims adjuster deviated from what Scottsdale's own insurance expert indicated "a claim professional would do." "A claim professional would evaluate liability as questionable and not reasonably clear," yet the claim manage denied there was any risk or any liability. *Id.* 461-3. Contrary to that claim analyst, the insurance expert lined up with Aliotta's boss and said that it was possible that a jury would find in favor of Plaintiff. Defendant's expert concluded that there was no duty to make any offer because liability was disputed, though cases with disputed liability get settled as a matter of course, JA 206-7.

Also, he pointed out that the direct case handler did not express any real concern about repeated questions related to racism. She seemed to be very reluctant to consider any evidence contrary to police testimony. Because it was "an active crime scene," she thought it wasn't appropriate to question how race may have been involved in police conduct or relevant to the case. *Id.* 85-6, relating to *id.* 525.

The file contains as well instances of inconsistent statements made by Officer Lusk, and a recommendation that he not be hired. It also showed no clear evidence of relevant higher education or vocational training related to human relations and diversity, contrary to the former Mayor, who relied heavily upon the screening process for police employment, and mandatory training. JA 687:10-21, 691:7-9. Berard concluded that the claim was likely not fairly evaluated.

> There are many grounds for suspecting that the police and the insurance company have not seriously considered all that they should have considered. The file contains references to the "n word." Many of the details in the file, especially taken together, and especially in light of attorneys' concern about racial stereotyping, discrimination etc. with respect to policing and insurance handling, should have alerted the insurance company to the racial aspects of the underlying case, though they generally denied that there was any racial aspect to the case at all.

*Id*.

As indicated *supra, Berard* wrote that depositions of claims adjusters and supervisor indicated significant differences in judgments on the likelihood Plaintiffs in the underlying case might be successful, between no chance and one in four chance.

Berard gave specific reasons that provide "circumstantial evidence" of discrimination. Like the evidence in *William*s, they showed that Scottsdale had a *de facto* policy that showed pretext.

A primary reason, as Berard testified that "[t]he mention of his arrest record, which is a stereotype associated with African-Americans, is problematic" JA 396:8-13.

27

This guilt by association went further, to statements about him being part of a "crew" in a derogatory comment that was initiated by some wrongdoing that Joe Porter got into. These comments did not individualize Joe but rather lump him with a brother who got into more trouble than Joe Porter did. JA 396:14-18. This "lumping" came in a case with a clear racial dimension.

Another specific basis came from "[m]ultiple claims made by different employees that they did not think there was any racial component to the case at all." They repeatedly claimed that the arguments of the Estate utterly lacked merit *Id.* 397:14-8 See *Williams v. Staples*, 372 F.3d at 669.

### F.    Credibility Aspects Bearing On The Duty To Investigate Should Have Defeated Summary Judgment

In *Williams,* a black customer's out of state check was refused, while his white friend's out of state check was honored. A statement by a store manager to the plaintiff conflicted with the policy as presented by the store at trial. The differences suggested a "*de facto* policy of deciding the matter on a case-by-case basis." 372 F.3d at 668-670.

Other contradictions appear here, as in *Williams.* As Berard noted, the statements by the former mayor contradicted the reasons that adjusters testified the mayor had told him were his reasons to refuse consent, JA 414:6-16. Windsor testified that "[t]hey felt they did not have liability for this situation and they strongly wanted to support their officer and his actions." *Id.* 616:13-16. The former mayor

28

expressly **denied** this latter motivation. JA 676:16-25. Such evidentiary conflicts indicate that summary judgment would be erroneous. <u>e.g.</u> *Chesapeake Bay Foundation, Inc. v. Weyerhaeuser Co.,* 2014 WL 3747128 *3 (4th Cir 2014)(overturning summary judgment, granted on statute of limitations, due to evidentiary conflict).

Also involving credibility was that nothing that Aliotta remembered from the file caused her to believe that the case was racially charged, or involved a racial component. JA 598:13-4, though she testified that she considered everything including whether the case was racially charged. *Id.* 597 She denied that was proper for Plaintiffs' counsel to be asking *voir dire* questions about race, *id.* 540-541, as the claim file reflected was going to happen in the underlying case.

Cynthia Hoekstra, Scottsdale's first assigned claims adjuster in the underlying case, testified that most cases, even of disputed liability, get resolved prior to trial. *Id.* 205-6. Aliotta testified that cases where liability is disputed get settled "all the time." *Id.* 568:2-4. Yet Scottsdale did not outline a negotiation plan, which is standard procedure, or even a plan of action, called for when a consent to settle was involved. *Id.* 580-1. Aliotta testified that the reason was that Scottsdale didn't see any liability, not even disputed liability. *Id*. 568:15-24. Yet her boss viewed the case as promising some potential liability. *Id.* 630:12-18.

29

**VI.    THIS COURT SHOULD REVERSE BECAUSE THE TRIAL COURT HELD THAT A CONSENT CLAUSE IN AN INSURANCE POLICY INSULATED THE INSURANCE COMPANY FROM ANY DUTY TO TAKE ANY ACTION DESPITE RECEIVING EVIDENCE OF RACIAL ANIMUS ON THE PART OF THE POLICYHOLDER**

The trial court stated that "[t]he insurance policy prevented Scottsdale form unilaterally acting." JA 752. "Even if it wanted to, Scottsdale could not unilaterally consent to any settlements." *Id.* 751. That is incorrect. It may have prevented Scottsdale from settling without consent in the sense that if it settled with the Estate in the underlying case, it might be liable to the City for breach of contract. The consent clause did not prevent, under *Michael* and *Fairmont*, Scottsdale from taking one or more actions.

Aliotta's testimony about failing to make an offer, again, was contradictory, starting with one reason and ending with only one reason. One reason was zero liability but that was eliminated in favor of the lack of consent. *Id.* 562-3.

Also, the consent clause plays an untimely role. A reasonable jury would be justified in finding that Scottsdale used the consent clause as a ruse in discriminating against the Estate on the basis of race. At times the consent clause is an absolute bar. Even if the city's motivation for refusing consent was racial, that would have made no difference to Scottsdale, *id.* 640:20-41:6. "[W]e didn't care about consent." *Id.* 484:12.

30

Again, **DIRECTLY CONTRARY** to her supervisee, and to her own testimony, Windsor stated that Scottsdale <u>did</u> care about consent. *Id.* 615:3-4. Aliotta testified, "[w]e were always open to anything." *Id.* 568:9.

The consent clause operated here to provisions raised by Defendants in *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S. Ct. 836 (1948). Those Defendants too hid behind a contractual provision, there in a deed prohibiting a grantor from transferring property to minority purchasers. "Here the particular patterns of discrimination are determined, in the first instance, by the terms of agreements among private individuals." 334 U.S. at 13, 68 S. Ct. at 842.

A. <u>The District Court Erred In Finding that Scottsdale Had No Options</u>

The district court referred to Scottsdale being unable to force the City to settle. Berard offered the option of trying to persuade the City, which was not done. JA 391-2. Berard aside, Scottsdale not even investigating or raising the issue of potential racial consideration in its withholding of consent, or even questioning the City as to whether or not it was a consideration, a practice that Windsor said occurred, amounts to assisting and aiding the City in what discovery discloses may have been an unlawfully motivated refusal to give consent.

Berard testified to the "obvious possibility that somebody from Scottsdale could also contact the City and discuss the matter. **I know from the records that that didn't occur."** JA 393: 2-3.

31

A second possibility was that:

> "the claims handler consult her manager, a special investigations unit, a specialist in the company or an attorney hired for that purpose to review the claim of a "racial nature," do a focused analysis of the potential conflict of the consent clause and the applicable state law, which is incorporated into the company policy by a statement to the effect that the claims handler must tailor their management of claims to applicable state laws,"

*Id*. 391:25-392:16

A special kind of review needed to occur, above the managerial level, with someone with training. *Id*. 467-8. That is the approach at the large university where Berard teaches, to handling claims of discrimination. *Id*. 470. Windsor suggested this approach when she testified that if she had concern that the holder of a consent provision was withholding consent because of racial animus, she "would probably have concerns about that, and I would address it with someone. I would probably talk about it within my organization." *Id*. 613:24-614:2.

That reasonable option, see *Fairmont Specialty* 206 W.Va. at 95-6, 522 S.E.2d at 189-90, would impose little burden, for Aliotta testified that she discussed all aspects of the claim file with her supervisor. *Id*. 535-6. Given the admitted possibility that prejudice can play a role in such cases, 537:245-538:10 prejudice should have been discussed in those discussions.

Apart from Berard's suggestion, Scottsdale could and should have taken reasonable things to meet its duty under the Human Rights Act. It could have filed a declaratory judgment action, seeking that a court rule on the validity of the consent clause in a case where racial issues had been raised regarding the invocation of that clause. Insurance companies do not hesitate to file suits seeking a ruling on the effect of policy provisions as applied to factual situations, e.g. *Scottsdale Ins. Co. v. Children's Home Soc. of North,* 2014 WL 4089347 (4th Cir.).

It could and should have done "something" in response to its knowledge of this case, its racial overtones, and the Estate's complaint about discriminatory settlement treatment. It did nothing.

While no West Virginia case apart from *Michael* and *Fairmont* are on point, *Kronjaeger v Buckeye Union Ins Co,* 200 W.Va. 570, 490 S.E.2d 657 (1997), provides guidance. In *Kronjaeger,* the insurance policy required the insured to give the insurer notice and provided the insurer with a consent to settle regarding any claim for underinsurance. Though the consent to settle was breached, the West Virginia court remanded the case for a determination of prejudice before the insurers could rely upon the consent to settle provision to deny coverage. Justice Davis also reiterated that the trial court should have denied summary judgment because it was "desirable to clarify the application of the law." 200 W.Va. 576, 490 S.E.2d at 663 (citation omitted).

33

*Kronjaeoge*rs reversed a grant of summary judgment in favor of the insurer. Thus breaching a consent to settle provision does not provide the limited options imagined by the district court here. Cf. *Carlile v. Farmers Ins. Exchange,* Cal.App.3d 97, 5, 219 Cal.Rptr. 773 (3rd Dist. App. 1985), where the court rejected a claim absent a showing any animus on the part of the holder of the consent provision. The matter arose in a state without a *Michael* duty, and the arbitration action suggested by that plaintiff only ran in favor of the possessor of the consent provision.

### B.     Courts Have Found Applications of Consent to Settle Provisions Void as Contrary to State Statute or Policy

Other courts have held that the application of consent to settle provisions are void and unenforceable in view of contrary state statutes. While that statute was the uninsured motorist statute in *Alabama Farm Bureau Mutual Insurance v Clem,* 273 So.2d 218 (Ala App. 1973), the statute here is the *HRA*. See *Validity, Construction, and Effect of No-Consent-to-Settlement Exclusion Clauses in Auto Insurance Policies,* 18 ALR 4th 249, § 8 (Cum. Supp.).

> [T]he reasonableness of the refusal to consent to settle is at issue. [A]t least some courts have addressed the factual issue of whether the insurer acted unreasonably in withholding its consent before the court undertook to determine whether an insured breached the consent-to-settle provision. See, e.g., *Alexander Mfg. v. Ill. Union Ins. Co.,* 666 F.Supp.2d 1185 (Dist.Ct.Or.2009) (in ruling on a motion for summary judgment based on the insured's alleged breach of a consent-to-settle provision, the court must address the reasonableness of the insured's decision to settle; "[a]n insured may act reasonably in breaching a consent-to-settle provision if the insurer unreasonably withholds consent.")

34

*Piedmont Office Realty Trust, Inc. v. XL Specialty Ins. Co.,* 769 F.3d 1291, 1294-5 (11th Cir. 2014).

Another analogy comes from recognized causes of action for aiding and abetting discrimination against a non-employee, such as an independent contractor. The D.C. Circuit recognized a claim against a hospital for gender discrimination in a job referral by a private duty nurse despite lack of "direct employment in the sense of the usual indicia of such employment" in *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1342 (D.C.Cir.1973). The district court in *Lewis v. UPMC Bedford,* 2009 WL 840385, 12 (D.C.W.D.Pa), similarly denied summary judgment in a claim by a doctor, an independent contractor, under the state human rights act for discrimination by a hospital and a chair of department of emergency medicine for aiding and abetting discrimination court relying upon interpretation of ADA(citations omitted).

Though granting summary judgment in part, the district court in *Martinez-Baez v. Rey-Hernandez,* 394 F.Supp.2d 428 (D.P. R.2005), applied a standard of whether defendants acquiesced in political discrimination against independent contractors. *Id.* at 437. See *Alch v. Superior Court,* 122 Cal.App.4th 339, 19 Cal.Rptr.3d 29 (2nd Dist.2004), approving claims by writers against talent agencies under state civil rights act, though those defendants were not in an employment relationship with the Plaintiffs.

35

Similarly, West Virginia law is clear that an employee states a claim for relief against an employer on basis of a hostile work environment, even if the hostile environment was created by customers, patrons, fellow employees, or non-employees. *Hanlon*, 195 W.Va. at 108, 464. S.E.2d 741, n 2 For an employer to permit that creation amounts to an acquiescence virtually identical to what Scottsdale did here.

## VII. THIS COURT SHOULD REVERSE THE DISTRICT COURT, WHICH RESOLVED DISPUTED ISSUES OF MATERIAL FACT IN FINDING THAT THE PLAINTIFF FAILED TO SHOW THAT THE REASONS BY THE INSURANCE COMPANY AMOUNTED TO PRETEXT

"Proof of pretext can by itself sustain a conclusion that the defendant engaged in unlawful discrimination. Therefore, if the Plaintiff raised an inference of discrimination through his or her prima facie case and the fact-finder disbelieves the defendant's explanation for the adverse action taken against the plaintiff, the fact finder justifiably may conclude that the logical explanation for the action was the unlawful discrimination."

*Mayflower Vehicle Systems, Inc. v. Cheeks*, 218 W.Va. 703, 629 S.E.2d 762 (2006), Syl Pt 5, in part, citing Syl Pt 5, *Skaggs*.

"Defendants are rarely courteous enough to admit in some documented form that an asserted rationale behind a discharge is really a pretext for an illicit motive."

*Burns v. Texas City Refining, Inc.*, 890 F.2d 747, 751 (5th Cir. 1989).

In finding that pretext was not shown, JA 758-764, the district court ignored another principle, that in discrimination cases, "[c]ourts take special care because state of mind, intent, and motives may be crucial elements." *Williams v Precision*

*Coil, Inc.,* 194 W.Va. 52, 459 S.E.2d 329, 338 (1995). "Summary judgment is often imprudent in discrimination cases that present issues of motive or intent," linking that limitation to the assignment of credibility determinations to the jury. *West Virginia Human Rights Commission v Wilson Estates,* 202 W.Va. 152, 503 S.E.2d 6, 14 (1988), <u>citing</u> *Precision Coi*l *,* 459 S.E.2d at 336, <u>citing</u> *Anderson v Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). <u>Accord</u> 10B Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE, Civil, 3d, §2730 at 9 ("The good faith or motive of defendant also plays a significant role in cases involving civil rights and discrimination," <u>citing</u> §2732.2).

Federal courts have considered "pretext" in various contexts in discrimination claims. Circumstantial evidence allowing the trier of fact "to infer intentional discrimination by the decision maker, includes:

> "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pre-textual reason for an adverse employment action."

*Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir.2011). <u>See</u> *Williams v. Staples*, where differences in treatment suggested a subjective "*de facto* policy" 372 F.3d at 670.

The process of finding pretext in several older West Virginia cases is instructive. In *City of Ripley v. HRC,* 179 W.Va. 375,378, 369 S.E.2d 226, 229

(1988). Defendant claimed that a female was not hired as a police officer because of cost to certify her at the State Police Academy but the court noted that the certification "requirement" had been used to exclude more than one female applicant. See *Montgomery General Hospital v. WVHRC,* 176 W.Va. 580, 586, 346 S.E. 2d 557(1986)(per curiam), reversing the circuit court, which had reversed the HRC. Later cited by *Skaggs,* 198 W.Va. at 72, 479 S.E.2d 582, *Montgomery Hospital* found pretext by evidence similar to evidence here. There contradictory testimony of the hospital's witnesses, including evidence that the hospital hired a full-time pharmacy worker subsequent to the purported drop in patient population; lack of an explanation for retention of a less senior worker as well as a part-time worker in the pharmacy, and lack of consistency in the hospital's expression of reasons for terminating the complainant. See also *State v. Logan-Mingo Mental Health Agency,* 174 W.Va. 711, 721, 329 S.E. 2d 77 (1985), where pretext was shown by a black employee being held to a higher standard.

In another per curiam case, *Fourco Glass v. State HRC*, 179 W.Va. 291, 367 S.E. 2d 760 (1988), the black employee was the only employee ever required to sign a statement waiving seniority rights to recall. This evidence of disparate treatment (along with other evidence, some referenced *infra* at A) led to the "inevitable conclusion that the [employer's] reasons for requiring [Plaintiff] to waive his seniority rights were pretextual." 179 W.Va. at 294, 367 S.E.2d at 763.

38

These factors have distinct echoes here. Many of the same facts already indicated as showing a *prima facie* case show pretext here. See *Logan-Mingo Mental Health Agency,* 174 W.Va. at 721, 329 S.E. 2d 77, where unequal application of "requirements" was found to be relevant at both prima facie case point and at the point of considering pretext. "A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000). Accord: *Williams v. Staples,* 372 F.33d at 669, reversing grant of summary judgment.

## A.    **Evidence From Berard Was Neglected Or Wrongly Rejected**

Contrary to the district court's characterization of Berard as "conclusory," JA 754-758 Berard enumerated "non-conclusory" reasons that provide evidence of discrimination. Like the evidence in *William*s, they showed that defendant's *de facto* policy indicated pretext.

[1]    Claims made by Scottsdale employees that they did not see any racial component to the case at all. "I attach great importance to the denial that this was a racial case at all." JA 397;14-5 *Supra* we show the inconsistency in Aliotta's testimony about the racial aspect of the underlying case.

39

[2]    Berard saw no professional reason to mark Joe Porter's arrest record or that of his brother. This connects to a stereotype associated with African-Americans. JA 395:2-396:13

[3]    This racial process went further, to statements:

"about him being part of a crew in a derogatory comment that was initiated by some wrongdoing that Joe Porter got into comments which do not individualize Mr. Porter but rather lump him with a brother who gets into more trouble than he did, that's also insensitive to a deceased person who was a minority in a case with a clear racial dimension.

*Id.* 395:14-21

When HPD lumped Joe Porter with his brother, the holder of the consent clause failed to give him individualized evaluation, lumping him another minority. Aliotta didn't know if this would cause her concern, though such "lumping together" seems to come close to the heart of racial stereotyping. Aliotta did think that statement that Joe deserved to die, *id* 937, did bear on the issue of a racial component. JA 518-9.

[4]    The record shows overt expressions of racial prejudice by employees of the City. *Id.* 396-7. Aliotta admitted that this would be something that she would want to know about. *Id.* 509:5-19. Wolfe expressed no remorse over using the "n word," as Berard testified, having review the former mayor's deposition. *Id.* 472:4-13.

[5]     Berard noted repeated claims by adjusters that the frivolous arguments of the Estate were done only for the purpose of harassment. *Id*. 397:18-20.

In addition, the Estate developed evidence that Scottsdale was spending tens of thousands of dollars, exclusive of attorney's fees and travel for those attorneys, in defending the case. When matched with other evidence *infra* at B and C as well as the finding that Scottsdale made no response to the demands and claims of discrimination by Plaintiffs' counsel, a reasonable inference was that a animus was involved here.

### B.    The Court Mishandled "Comparator" Evidence

The district court complained about "comparator evidence," that it could not identify the race of the decedents. JA 754. That was due to the insurance company record-keeping. *Id.* 36-7. As Plaintiffs complained, the insurance company so constructed its data base that it (or others such as Plaintiff) would be unable to analyze its actions on the basis of race. See *McDonnell-Douglas*, which found evidence of better treatment meted out to white employees "especially relevant." 411 U.S. at 804, 93 S. Ct. at 1825. What is important is that Scottsdale repeatedly relied upon such subjective explanations identical to "liability remained contested," JA 750, to deny making an offer in death cases involving minority plaintiffs.

41

Given the importance of such evidence, omission of race, by the party record-keeper, is too small to deny any weight to such a pattern. <u>See</u> *Williams v. Staples, Inc.,* 372 F.3d at 668, an action under *42 USC § 1981*, <u>citing</u> *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir.1993), recognizing that a comparison of two separate incidents will likely never involve the exact facts and that a court should compare the more salient factors from both incidents. This evidence helps to show that a jury should have heard such evidence.

### C.    <u>The Trial Court Fully Credited Testimony By Adjuster Aliotta, Resolving Facts, That The Case Was Not Racially Charged</u>

The district court fully credited testimony by Aliotta. "In Aliotta's deposition, when asked repeatedly if the case was racially charged or contained racial overtones, she consistently answered 'no.'" JA 759. This she did, but with significant credibility issues.

Not only did the trial court resolve facts. It did not consider contrary credibility aspects to that very testimony, which should have prohibited summary judgment. The district court stated that "none of the individuals involved in the settlement or claim process displayed even a hint of discriminatory behavior. JA 762.

First, Aliotta's testimony presents an inherent credibility defect. She saw no racial aspect to a trial, arising out of an incident where a white cop shot a black man and, more importantly, the witnesses on the side of the police officer were white and those for the deceased were black. <u>See</u> *supra* at VA.

42

Second, the evidence showed that adjuster never saw a racial aspect, not even in the trial of OJ Simpson case, contrary to the majority of America, and her co-workers, ███████████████████. Even the Mayor of Huntington conceded that some of the media claimed that the Simpson case was "racially charged." *Id*. 669:14-20. While Scottsdale tried to claim that the Simpson case was mentioned merely to inflame the court, the analogy between cases seemed apt, and not only because Dr. Michael Baden performed a similar role in both cases. In the Simpson case, mentioned in Baden's blurb about himself, which was inserted into the Claim File, *id*. 965, the argument was not that the death of a white person at the hands, the State claimed, of a black, was racially motivated. The racial focus in both cases was not the homicide itself but upon the divide of witnesses, there a white detective and a black defendant, along racial lines. Even the Mayor of Huntington conceded that some of the media claimed that the Simpson case was "racially charged." *Id.* 669:14-20. While Scottsdale tried to claim that the Simpson case was mentioned merely to inflame the court, the analogy between cases seemed apt, The argument was not that the death of a white person at the hands, the State claimed, of a black, was racially motivated. The racial focus in both cases was not the homicide itself but upon the divide of witnesses, there a white detective and a black defendant, along racial lines.

A third credibility aspect was that Aliotta was contrary to her own boss, who admitted a racial component IN THE PORTER CASE, though not understanding what "racially charged means, I guess." JA 623:6-7, 624:5-9.

Fourth, the trial court simply ignored additional credibility aspects shown by the Estate's analysis of the Scottsdale Claim File and its racial references.

Also, the trial court ignored the finding of Dr. Berard, that the concern, about whether race was a factor in City's refusal to consent, was magnified by fact that it was a public entity that the insurance company was dealing with, "related to which there is a particular responsibility not to use race as a factor in evaluating cases." *Id.* 83. Confirming such an elevated concern, this "very important," "severe" claim, *id.* 621:3-6, was transferred from Hoekstra to Aliotta because it arose against a "public entity," *id.* 185:21-186:4

### D.    <u>The District Court Found Factually As To Causation</u>

It found factually that the consent clause explains "why no settlement occurred" JA 759, ignoring the specific options described *supra* and by Berard generally. <u>Cf.</u> *Hopkins*, where the expert helped explain causation, 490 U.S. at 235-6, 109 S. Ct. at 1183, even though her evidence was conditional. 490 U.S. at 236, 109 S. Ct. at 1873 ("Fiske admitted that she could not say with certainty whether any particular comment was the result of stereotyping"). Thus the rationale of the

44

district court, which found that Berard did not show pretext because his testimony was conditional, JA 761, would have eliminated the Fiske evidence in *Hopkins*.

### E.    The District Court Erred As Matter Of Law Regarding "Deviation" Testimony

As the district court seems to have found, *id.* 762, and the insurance company seemed to concede, deviations occurred here ("a formal action plan was not drafted and Scottsdale itself did not respond to the plaintiffs' counsel's letters regarding settlement," *id.* at 763) The district court found that any deviations were excused by lack of a consent to settle.

Inconsistency loomed even larger here, as Berard testified to at least five deviations from company policy. While the industry "expert" relied upon alleged "consistency with industry standards," Murphy Report, Berard was much more specific, *id.* 463:4-20. A key deviation, *infra* at VIII E, to which Berard pointed involves the lack of response to Plaintiffs' counsel's letters, for Scottsdale rules require adjusters have a duty to act in good faith, to respond. *Id.* 431-2. The chief adjuster admitted a duty to respond. *Id.* 561:6-562:5. The adjuster previously handling the claim conceded that Scottsdale policy contemplated a response within a reasonable period of time. *Id.* 212:16-213:4. The boss Windsor confirmed that she would have expected there to be a response. *Id.* 651:13-24 Contrary to the district court, *id.* 763-7, Aliotta identified the duty to respond as a responsibility not relieved by lack of consent. 561:6-562:5. Lack of consent was

45

"not why I didn't respond." 561:18-20. <u>See</u> *Fourco Glass*, 179 W.Va. at 294, 367 S.E. 2d at 763 (1988), finding pretext in part because of departure from normal business practice.

Were this case arising under the *Unfair Trade Practices Act,* the insurance company's refusal to respond to the letters would show a violation of *W.Va. Code 33-11-4 (9) (b)*. Its refusal to do so in a claim under the Human Rights Act is just as probative. Yet the district court referred to it as an "alleged" duty. JA 762.

Scottsdale policy required the claims handler to develop a settlement "negotiation plan" even in cases of disputed liability, and an action plan, even where consent was involved. *Id.* 581-2. Scottsdale did not develop plans.

Fundamentally district court indicated that Plaintiff must show that all deviations, occurred **because of animus**. *Id.* 763. That is wrong as a matter of law. **The deviations help show the animus**. <u>See</u> *Merritt v Old Dominion Freight Line,* 601 F3d 289, 297-8 (4th Cir. 2010)(inconsistent application of little known policy helped provide basis for reversal of summary judgment in a discrimination case); *Blankenship v Caterpillar Global Mining, LLC.*, 964 F.Supp.at 592, 593, indicating that deviations help show both a prima facie case and pretext.

The concurrence in *Old Dominion* states that "this court will evaluate the actual application of employment tests and practices that employers claim to apply in a neutral manner." 601 F.3d at 302. Deviation from regular procedures is thus a

classic example of evidence used to show pretext in a state law claim. *Vaughan v. Metrahealth,* 145 F.3d 197 (4ᵗʰ Cir.1998), <u>abrogation on other grounds recognized by</u> *Leake v. Ryan's Family Steakhouse*, 5 Fed. Appx. 228 (4ᵗʰ Cir. 2001) *Vaughn* arises from an age-discrimination claim involving a reduction in force brought under federal law. "As the Fifth Circuit explained: Proof that an employer did not follow correct or standard procedures in the termination or demotion of an employee may well serve as a basis for a wrongful discharge action under state law." *Vaughan,* 145 F.3d at 203.

Failure to follow established procedures with respect to an employee's discharge has been held to support a finding of discriminatory discharge. *Hamilton v. 1st Source Bank,* 895 F.2d 159, 162 (4ᵗʰ Cir. 1990), affirming jury award in discharge case. <u>Cf</u> *Stiles v. Gen. Elec. Co,* 986 F.2d 1415 (Table), 1993 WL 46889 (4ᵗʰ Cir.) (internal citations omitted)(per curiam), where the court added that deviation from established procedures creates no presumption of discrimination when there is little other evidence supporting a finding of discrimination. At *4 Reversing a grant of summary judgment, *Stiles* added that, "Unlike Hamilton, there has been no allegation here that GE ignored established procedures in dealing with Stiles, but applied the procedures in dealing with other employees." *Id.*

This case fits into the rule in *Hamilton,* a signed case, rather than the *Stiles* exception. The procedures were not followed in this case. Additionally, significant other evidence appears in this case beyond deviations from established procedures.

Application of this principle in this case matches other state and federal case law. "A plaintiff may also raise a triable issue of pretext through evidence that an employer's deviation from established policy or practice worked to her disadvantage." *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1117 (9th Cir.2011)(citations omitted) "We conclude that evidence that BFI may have deviated from its normal management procedures when it summarily terminated Dartt could support a reasonable inference that BFI had terminated Dartt because of his perceived handicap." *Dartt v. Browning-Ferris Indus., Inc. (Mass.),* 691 N.E.2d 526, 536 (Mass 1998).

> F.    The District Court Ignored Factual Disputes of Material Fact

Particularly significant to the issue of whether or not the case was "racially charged," and whether or not improper racial considerations were involved in the City's refusal to give "consent" to settle the case, was evidence adduced in discovery in the underlying case, and made exhibits in the deposition of Aliotta, that indicated that historically there was specific racial animus directed against Joe Porter and his family (use of the "n" word) by more than one member of the HPD as well as a history of harassment of Hackett. *Id.* 396-78; 825, 844-5 (Ferguson); 923-4, 919 (Hackett) This evidences racial animus on the part of the City.

Despite this evidence, Defendant's claim representatives who handled the claim denied any knowledge that the case was racially charged, and claimed not to remember learning of any evidence of specific racial animus, though agreeing such evidence (and similar evidence) would have been important for them to know.

## VIII. THIS COURT SHOULD REVERSE THE DISTRICT COURT'S AFFIRMANCE OF THE DECISION BY THE MAGISTRATE COURT RESTRICTING DISCOVERY ON THE BASIS OF ATTORNEY CLIENT PRIVILEGE AND WORK PRODUCT EXCEPTION

### A.    <u>Standard of Review</u>

"This court reviews a district court's discovery orders for abuse of discretion."*Carefirst of Maryland, Inc. v Carefirst Pregnancy Centers*, 334 F.3d 390, 396 (4th Cir. 2003)(citations omitted).

The court permitted Plaintiff to get access only to documents that "do not contain the mental impressions, thoughts, and conclusions of Defendant in

evaluating a legal claim, nor include privileged communications." JA 53-82. The

Decision relied upon *Mordesovitch v Westfield Insurance*, 244 F.Supp. 2d 636, 647

(S.D. W.Va. 2003), concluding that there were other ways for plaintiff to prove his

case, e.g. by deposing the adjuster. JA 77. This was done, and glaring

inconsistencies, s*upra*, resulted, but ignored.

## B.     The Burden Of Proof Rested on Scottsdale, Which Did not Discharge It

> "As the attorney-client privilege and the work product exception may
> result in the exclusion of evidence which is otherwise relevant and
> material and are antagonistic to the notion of the fullest disclosure of
> the facts, courts are obligated to strictly limit the privilege and
> exception to the purpose for which they exist."

*State ex. rel. United States Fidelity and Guar. Co. v. Canady,* 194 W. Va. 431, 438,

460 S.E.2d 677, 684 (1995)

The burden is on the party resisting discovery to show that the documents are

protected, as the attorney-client privilege and the work product exception may result

in the exclusion of evidence which is otherwise relevant and material and are

antagonistic to the notion of the fullest disclosure of the facts, courts are obligated

to strictly limit the privilege and exception to the purpose for which they exist." *State*

*ex. rel. United States Fidelity and Guar. Co. v. Canady,* at *id.*

The Court conceded the relevance of the material but only "to the issues which

Plaintiffs have injected into the case." JA 75. Otherwise, racial issues were inherent

to the case itself. The Estate sought the evidence as additional material to show how

race appeared in the file as a reason not to settle. Thoughts of the adjusters and the defense attorneys would have permitted Plaintiff to develop additional evidence that race played a role in that evaluation.

Contrary to the suggestion that Plaintiffs were claiming that the privilege and the exception were "relaxed" in a discrimination case, Plaintiffs showed that, when attorney's activities in discrimination cases become an intimate part of the claimed discrimination, they are discoverable. See *State ex rel. Westbrook Health Services, Inc. v. Hill,* 209 W.Va. 668, 671, 550 S.E.2d 646 (2001)(per curiam), which involved discovery in an employment case. That court held that no attorney-client privilege attached to discussions between non-management employees and counsel for the employer. 209 W.Va. at 670. Citing *State v Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979), *Westbrook* shows that Scottsdale should have been required to prove that the attorneys and adjusters expected that their conversations would be confidential, and that their conversations aimed to get legal advice.

**Work Product Exception Did Not Protect Documents Sought**

To qualify as work product, the document must have been prepared in anticipation of litigation, and not in the ordinary course of business. See *Mordesivitch*, finding fee information in notes and fee engagement letters were prepared in the ordinary course of business and not in anticipation of litigation. 244 F.Supp.2d at 636. Accord *State ex rel Montpelier v Wolloitz,* 2014 WL 1408487

(W.Va.)(per curiam), holding billing statements not protected. Thus, "anticipation of litigation" must be construed narrowly.

The district court violated the narrow construction of opinion work product in *State ex rel. Erie Ins. Property & Cas. Co. v. Mazzone*, 220 W.Va. 525, 533, 648 S.E.2d 31, 39 (2007), ruling that reserves are not opinion work product. See *In Re Martin Marietta*, 856 F.2d 619, 626 (4th Cir 1998), setting fact work product as a default position. "What should not be ordered to be disclosed are pure expressions of legal theory or mental impression." 856 F.2d at 626. Thus, Scottsdale should have been required to prove that the documents were opinion work product and withheld.

## C.     **What Some Have Dubbed "Directly At Issue" Waiver Requires Disclosure**

More generic "at issue waiver" protects more documents than "directly at issue waiver." The former occurs where a party place the attorney's thoughts in issue by asserting "advice of counsel," *Mordesovitch*, citing *USF&G*, 467 S.E.2d at 688.

The "at issue" doctrine generally is applied to the attorney-client privilege and the work product doctrine when the party puts 'at issue' some fact which necessarily involves an examination of the attorney's advice or communication to the client. *IntegraMed America, Inc. v. Patton,* 2014 WL 1400786, 3 (D.S.C.)(citations omitted).

The district court found that the ONLY METHOD is by pleading "advice of counsel" JA 77.

Epstein delineates a "variety of contexts where actions of counsel are placed in issue." *The Attorney Client Privilege and the Work-Product Doctrine* (5th ed.*)* at 552. None of these require a pleading of magic words that the party "relied upon the advice of counsel." "Directly at issue" waiver does not require the party's affirmative act.

> [P]laintiffs, in the right circumstances, are also given access to the work product of defendant's counsel in some prior proceeding another type of claim where a plaintiff has a good chance of obtaining attorney work product from defendant's counsel is where a claim is made that an insurance company refused to settle an insurance claim or when a claim is made that an action was prosecuted maliciously. In each instance, what the attorney knew, when the attorney knew if, and how the attorney knew is likely to be a crucial issue in content and to form the basis of the proof of the claim. Thus, the nature of the claim itself puts work product often necessarily into play.

Epstein at 963, <u>citing</u> *inter alia Holmgren v State Farm*, 976 F.3d 573 (9th Cir. 1992).

<u>See</u> *Republic Ins. Co.*, 856 S.W.2d at 163 ("the confidential communication must go to the very heart of the affirmative relief sought").

In the intimacy of the involvement of the attorneys and adjusters, this case mirrors those cases where courts grant access to documents because the attorneys were involved in investigating a complaint of discrimination:

> "when a Title VII defendant affirmatively invokes a defense that is premised on the results of an internal investigation, the defendant waives the attorney-client privilege and work product protections for not only the report itself, but for all documents, witness interviews, notes and memoranda created as part of and in furtherance of the investigation."

*Koss v. Palmer Water Dept.* 2013 WL 5564474, 1 -2 (D.Mass)(citation omitted).

Here the investigation was "absolutely" important. JA 621:8-12. Regarding lack of consent "I would certainly discuss it with counsel." *Id.* 14:21. "It's the defense counsel that having these discussions with them." *Id.* 15:18-9.

Though the Decision rejected *Morrow v. Brown, Todd & Heyburn*, 957 S.W.2d 722, 725 (Ky. 1997), the attorney and adjuster involvement here closely resembled the action of the attorneys there. Morrow sued plaintiff's lawyers, claiming that they lacked probable cause to pursue an underlying dental malpractice suit against him. Denied portions of the plaintiff lawyer's files, summary judgment was granted against him. The court held that Morrow was entitled to the withheld documents, relying upon "at issue" exception.

Moreover, while bad faith cases are important to the parties, they are less important to society as a whole. Discrimination, particularly racial discrimination, runs.

> "contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." W.Va.Code, 5-11-2 [1998]. Notably, this Court, in *Allen v. West Virginia Human Rights Commission,* 174 W.Va. 139, 324 S.E.2d 99 (1984), held that "every act of unlawful discrimination in employment ... is akin to an act of treason undermining the very foundations of our society." 174 W.Va. at 148, 324 S.E.2d at 108. Surely, they contend, punitive damages must be available in appropriate cases as a sanction against such undesirable conduct.

*Haynes v. Rhone-Poulenc, Inc.* 206 W.Va. 18, 32, 521 S.E.2d 331, 345 (1999)

*Holmgren v State Farm* falls squarely in the middle of cases "where the mental impressions, particularly of the adjuster and counsel, are crucial: "the rule permits discovery when mental impressions are the pivotal issue in the current litigation and the need for the material is compelling." 976 F.2d at 577.

*State ex rel United Hospital v Bedell,* 199 W.Va 316, 484 S.E.2d 199 (1997), endorses this doctrine.

> "[W]hen the activities and advice of counsel became an issue which is crucial to matter of resolving claims of bad faith settlement under and insurance contract, this constitutes another exception to the near absolute protection given to opinion work product. In such instances, it appears that the attorney's very opinion will in some way affect the fact-finding process."

199 W.Va at 333-4, 484 S.E.2d 199, n 22 (citations omitted)

*State ex rel. Erie Ins. Property &Cas. Co. v. Mazzone* notes the adoption of the crime-fraud exception. 220 W.Va. at 533, 648 S.E.2d at 39 n 5 (citation omitted). This exception to the application of a privilege arises where the communication furthers a tort. Epstein at 724 *et seq*, citing *Royal Surplus Lines co. v Sofamor Danek Group*, 190 F.R.D. 505 (WD Tenn 1999), extending the crime-fraud exception to a case where misrepresentation occurred in placement of excess insurance coverage and *In Re A.H. Robins*, 107 F.R.D. 2, 14 (D.Kan 1985), ordering production where documents related to misrepresentation See also Esptein at 963, citing *inter alia Bird v Penn Cent Co*., 61 FRD 43, 47 (E.D. Pa. 1973). *Royal Surplus* held that the privilege did not attach to documents prepared by employees even if an attorney had

been contacted about the matter, if the attorney was not involved in meetings and conversation. Nor did the privilege attach to meetings that attorneys attended functioning as businessmen, rather than as attorneys giving legal advice to clients.

The tort here rises to a level to equal fraud or misrepresentation. West Virginia elevates anti-discrimination laws in the very highest place. *Haynes* at *Id.*

### D. Plaintiffs Should Get Documents Addressing Potential Large Loss Or Excess Liability As Fact Work Product

Since no settlement offer was made, JA 762-3, a large valuation would prove that the reason that Scottsdale advances, the consent to settle amounts to pretext under *Michael.* It would DIRECTLY contradict the statements from Aliotta about utter lack of liability. *Id.* 568:15-24. These documents would include two letters, one from Hoekstra and one from Aliotta, to the City attorney, as well as a report and log, the former without author or recipient, the latter by Hoekstra.

### E. The District Court Abused Its Discretion In Failing To Provide Internal Response To The "Policy Limits Demand"

As indicated *supra,* Scottsdale did not respond at all to two demands. JA 762-3. Supplying a rationale for this inaction, three documents from February 2012 and by Aliotta were directly crucial to the issues involved. Their subjects include "policy limit demand." Seven other documents addressed ADR and its strategy or evaluation. They should have been provided. Created at a time when the case was being evaluated, these were crucial documents. See *United States v. (Under Seal),*

56

748 F.2d 871, 876 (4th Cir.1984)(movant can articulate the necessity for the documents and show an alternative source to obtain the substantial equivalent is unavailable. The adjusters were deposed in Arizona and the effect of the ruling excluded all written evidence related to the perception by trial counsel or adjusters.

## CONCLUSION

   This Case should be reversed and remanded for trial.

   Oral argument would aid understanding of this case, described as a case of first impression by Scottsdale.

Respectfully submitted,

LEVERT SMITH and
NELSON D. RADFORD, Co-
Administrators of the Estate of
Joseph Jeremaine Porter, Plaintiffs

/s/Timothy F. Cogan

  Of Counsel

Patrick S. Cassidy, Esq. (W.V. Bar No. 671)
Timothy F. Cogan, Esq. (W.V. Bar No. 764)
CASSIDY, COGAN,
SHAPELL & VOEGELIN, L.C.
The First State Capitol
1413 Eoff Street
Wheeling, WV 26003
Telephone: (304) 232-8100
Facsimile: (304) 232-8200

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains 13,331 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using Microsoft Word in 14 point Times New Roman.

February 23, 2015                                    /s/ Timothy F. Cogan
                                                     Timothy F. Cogan

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 23, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Thomas Scarr Esq.
Sarah Walling Esq
JENKINS FENSTERMAKER PLLC
325 8th Street, Po Box 2688
Huntington Wv 25726-2688
Bjk@Jenkinsfenstermaker.Com
Gam@Jenkinsfenstermaker.Com

Denise Pentino, Esq.
DINSMORE & SHOHL LLP
Bennett Square, 2100 Market Street
Wheeling Wv 26003
Denise.Pentino@Dinsmore.Com

I further certify that the required numbers of any sealed documents were served, via UPS Ground Transportation upon the counsel listed above.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219

# ADDENDUM

W. Va. Code, § 5-11-9§ 5-11-9. Unlawful discriminatory practices

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

(1) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled: Provided, That it shall not be an unlawful discriminatory practice for an employer to observe the provisions of any bona fide pension, retirement, group or employee insurance or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this subdivision;

(2) For any employer, employment agency or labor organization, prior to the employment or admission to membership, to: (A) Elicit any information or make or keep a record of or use any form of application or application blank containing questions or entries concerning the race, religion, color, national origin, ancestry, sex or age of any applicant for employment or membership; (B) print or publish or cause to be printed or published any notice or advertisement relating to employment or membership indicating any preference, limitation, specifications or discrimination based upon race, religion, color, national origin, ancestry, sex,

disability or age; or (C) deny or limit, through a quota system, employment or membership because of race, religion, color, national origin, ancestry, sex, age, blindness or disability;

(3) For any labor organization because of race, religion, color, national origin, ancestry, sex, age, blindness or disability of any individual to deny full and equal membership rights to any individual or otherwise to discriminate against such individual with respect to hire, tenure, terms, conditions or privileges of employment or any other matter, directly or indirectly, related to employment;

(4) For an employer, labor organization, employment agency or any joint labor-management committee controlling apprentice training programs to:(A) Select individuals for an apprentice training program registered with the state of West Virginia on any basis other than their qualifications as determined by objective criteria which permit review;(B) Discriminate against any individual with respect to his or her right to be admitted to or participate in a guidance program, an apprenticeship training program, on-the-job training program or other occupational training or retraining program;(C) Discriminate against any individual in his or her pursuit of such programs or to discriminate against such a person in the terms, conditions or privileges of such programs;(D) Print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for these programs or to make any inquiry in connection with a program

Add. 2

which expresses, directly or indirectly, discrimination or any intent to discriminate unless based upon a bona fide occupational qualification;

(5) For any employment agency to fail or refuse to classify properly, refer for employment or otherwise to discriminate against any individual because of his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability;

(6) For any person being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodations to:(A) Refuse, withhold from or deny to any individual because of his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations;(B) Publish, circulate, issue, display, post or mail, either directly or indirectly, any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities, privileges or services of any such place shall be refused, withheld from or denied to any individual on account of race, religion, color, national origin, ancestry, sex, age, blindness or disability, or that the patronage or custom thereat of any individual, belonging to or purporting to be of any particular race, religion, color, national origin, ancestry, sex or age, or who is blind or disabled, is unwelcome, objectionable, not acceptable, undesired or not solicited; or

Add. 3

(7) For any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to:(A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section;(B) Willfully obstruct or prevent any person from complying with the provisions of this article, or to resist, prevent, impede or interfere with the commission or any of its members or representatives in the performance of a duty under this article; or(C) Engage in any form of reprisal or otherwise discriminate against any person because he or she has opposed any practices or acts forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.


W. Va. Code Ann. § 5-11-9 (West)